J-S24031-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.E.-B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 238 WDA 2021 |

Appeal from the Order Entered January 29, 2021
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0000015-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: S.B, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: K.E.-B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 239 WDA 2021 |

Appeal from the Order Entered January 29, 2021
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0000016-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: D.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: K.E.-B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 240 WDA 2021 |

Appeal from the Order Entered January 29, 2021
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0000017-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: H.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

:
:
:
APPEAL OF: K.E.-B., MOTHER      :
:
:
:
:
:    No. 241 WDA 2021

Appeal from the Order Entered January 29, 2021
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0000018-2020

BEFORE:   DUBOW, J., KING, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:       **FILED: AUGUST 31, 2021**

Appellant, K.E.-B. ("Mother"), files this appeal from the permanency review orders in the Jefferson County Court of Common Pleas, changing the permanent placement goal of her dependent children, twins R.B. and S.B., born in January 2018; H.P., born in April 2013; and D.P., born in November 2011 (collectively, the "Children"), to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[1]  After review, we affirm.

Subsequent to a grant of emergency protective custody, the trial court adjudicated the Children dependent on March 31, 2020.  The family had been known to Jefferson County Children and Youth Services (the "Agency") and had been provided services since November 2018 as a result of concerns

---

* Former Justice specially assigned to the Superior Court.

[1] C.B., the father of R.B. and S.B., is incarcerated at Torrance State Hospital. Notes of Testimony ("N.T."), 1/27/21, at 9, 17.  C.P., the father of H.P. and D.P., has not had contact with Children and Youth Services caseworkers.  ***Id***. at 9.  Neither C.B. nor C.P. is a participating party in the instant appeals.

relating to chronic lice, mental health, domestic violence, home conditions, hygiene, behavioral issues for H.P., and the Children acting out sexually. The Children, as well as two other children who are not subjects of these appeals, were removed from the home. N.T., 1/27/21, at 5. While R.B., S.B., and H.P. are placed together, D.P. is placed separately. *Id*. at 6.

The trial court initially established the permanent placement goal for each of the Children as "return to parent or guardian." Orders of Adjudication and Disposition, 3/31/20. Over the remainder of the year, the trial court conducted regular review hearings where it maintained the Children's placement and permanency goal and added a concurrent goal of adoption.

At a permanency review hearing on January 27, 2021, the Agency recommended a goal change to adoption with respect to each of the Children. N.T., 1/27/21, at 10. Mother was present and represented by counsel. While neither father was present, each was represented by counsel. Further, the Children were represented by a guardian *ad litem*.[2]

The Agency presented the testimony of Emily Feicht, Agency caseworker, and Mother presented the testimony of Ginger Fox, JusticeWorks Youth Care, Jefferson County, family resource specialist. Additionally, Mother testified on her own behalf. Lastly, the guardian *ad litem* presented the testimony of Corey Yaris, Community County Services.

---

[2] The guardian *ad litem* argued in favor of a goal change at the hearing, and submitted a joint brief with the Agency. *Id*. at 53-54.

At the conclusion of the hearing, the trial court changed the permanent placement goal of the Children to adoption. On February 12, 2021, Mother, through counsel, filed four separate notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925. On March 10, 2021, this Court consolidated the cases *sua sponte*.

On appeal, Mother raised the following issue for our review, "[w]hether the [t]rial [c]ourt erred in changing the permanency goal to Adoption?" Mother's Brief at 2 (suggested answer omitted).

In addressing whether the trial court appropriately changed the Children's permanency goal to adoption, we review for an abuse of discretion. ***In the Interest of L.Z.***, 631 Pa. 343, 360, 111 A.3d 1164, 1174 (2015) (citing ***In re R.J.T.***, 608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)). Moreover, "the standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." ***L.Z.***, 631 Pa. at 360, 111 A.3d at 1174 (quoting ***In re R.J.T.,*** 608 Pa. 9, 9 A.3d at 1190).

Our review of the goal change order is also guided by the following principles:

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the

appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa.Super. 2011) (citations and quotation marks omitted).

In relation to the significance of the best interest of the child, we further stated:

[T]he focus of all dependency proceedings, including change of goal proceedings, must be on the safety, permanency and well-being of the child. The best interest of the child takes precedence over all other considerations, including the conduct and the rights of the parent. [W]hile parental progress toward completion of a permanency plan is an important factor, it is not to be elevated to determinative status, to the exclusion of all other factors.

*In the Interest of M.T.*, 101 A.3d 1163, 1175 (Pa.Super. 2014) (citing *In re A.K.*, 936 A.2d 528, 534 (Pa.Super. 2007)). We emphasize that, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re N.C.*, 909 A.2d 818, 824 (Pa.Super. 2006) (quoting *In re Adoption of M.E.P.,* 825 A.2d 1266, 1276 (Pa.Super. 2003)).

Additionally, Section 6351(f.1) of the Juvenile Act requires the trial court to make a determination regarding the child's placement goal:

**(f.1) Additional determination.—**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
. . .

- 5 -

> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1).

In determining to change the Children's permanent placement goal from return to parent or guardian to adoption, the trial court reasoned:

> Here[,] the [c]ourt changed the children's permanency goal on January 27, 2021, at which time the children had been with their respective foster families for nearly 11 months. There[,] all four have thrived. [D.P. and H.P.], in fact, have progressed beyond the Agency's expectations. Conversely, too much interaction with Mother has proven to be stressful for them; it has lead to behavioral regression in [H.P., S.B., and R.B.], while [D.B.] has expressed to both CYS personnel and Mother his hurt and anger over her unwillingness to be more proactive and do what she needs to do to achieve reunification.
>
> Because this is a goal change, not a termination of parental rights, Mother's conduct is not directly at issue. To the extent that it informed the [c]ourt's decision, however, it is decidedly relevant. It is relevant, for instance, that Mother, even after nearly a year, either failed or refused to understand how her own mental health issues affected her behavior and progress. In her mind, weekly sessions with a CORE counselor were all she needed. More intensive mental health treatment, she felt, would actually be harmful. She thus declined additional services even after the case worker explained the treatment team's concerns and why they believed she would benefit from them. It is relevant, moreover, that Mother was unwilling to get involved in [H.P.]'s treatment and chose to sever relations with service providers who were suggesting courses of action she did not wish to pursue, as it told the [c]ourt that she was only willing to cooperate with CYS and its affiliates to the extent that she thought their services were useful.
>
> Mother's own testimony further indicated that anything beyond the basic requirements she felt were appropriate would have to be done on her terms. Speaking of additional mental

health services, for instance, she testified that she refused because she did not understand exactly what the case worker wanted her to do. "And it —well, that was brought up about —I don't think the day treatment, just about the —something about more mental health treatment, and I didn't understand what they meant," she said. She apparently did not seek clarification, either, whether at the time the case worker broached the subject or after discussing the day treatment option with her attorney in November.

Mother did follow up by saying that she would be willing to participate in day treatment if she knew more about it. By then it was too late, though, and not credible in any event. What she actually meant, her overall testimony implied, was, "I would be willing to participate if I knew more about it and thought it would help me." She confirmed as much when she said a few pages later in the transcript that she felt the progress she was making during her weekly sessions was adequate and that the therapist she was treating with was the only person with whom she was comfortable. More specifically, she confirmed that anything more had to be on her terms, adding, "I can go more.[] I'm just saying, I can't do more with, I feel, like, other therapists. If I need to go more with the therapist that I have, then I will, but nobody told me that I needed to do more with my therapist." What [the Children] need, though, is someone who will do whatever is necessary to meet their needs, not someone whose self-focus leads her to do only what is comfortable for her.

That is not to denigrate Mother. From what the [c]ourt knows, her own history involves a significant amount of trauma, and it may be that she is doing the best she believes she can do right now. Nonetheless, her conduct, as well as her statements to her service providers and this [c]ourt, bespeak a mindset not conducive to reunifying with her children within a reasonable period of time. They tell the [c]ourt that continuing to wait for Mother to achieve the emotional wherewithal she would need to raise four children would deny [the Children] a legitimate avenue toward permanency into the foreseeable future.

In light of the foregoing, the timeline in this case did not suggest an abuse of discretion, either. After nearly eleven months, Mother had made little progress toward alleviating the circumstances that had warranted dependency in the first place. Whereas the children's best interests and concluding the placement process within 18 months were the legally defined

objectives, therefore, the [c]ourt did not abuse its discretion by changing the goal for each from reunification to adoption.

Trial Court Opinion, 4/13/21, at 1-3 (citations to record omitted).

Mother, however, argues that the trial court erred with respect to the goal change to adoption, as it was not in the Children's best interests. Mother's Brief at 4. Mother indicates that she actively participated in visits and cooperated with visit coaching and recommendations offered. *Id.* at 4-5. She likewise completed parenting classes and participated with service providers to address housing. *Id.* at 5, 7. Mother posits that she was compliant with mental health services and engaged in mental health treatment. She suggests that there were no discussions with her regarding any additional mental health treatment recommendations. *Id.* at 5-6. Moreover, Mother points to the fact that, at the time of the hearing, the Children had only been in placement for eleven months. *Id.* at 7.

Noting that a goal change to adoption has been viewed as a signal of parental inadequacy despite the provision of services, Mother asserts, "The [t]rial [c]ourt errored [sic] by deciding the Agency provided adequate services and that Mother is incapable of caring for the children." *Id.* at 7-8.

Upon review, Mother's challenge to the goal change orders lack merit. The record reveals that a change of the permanency goal to adoption was in the Children's best interests. Significantly, after almost one year, Mother failed to demonstrate progress toward reaching the goal of reunification. N.T., 1/27/21, at 22.

We recognize that Mother completed parenting classes and worked with Ms. Fox on her housing goal by submitting paperwork to the Jefferson County Housing Authority. *Id.* at 27-28, 33, 36. However, while Mother complied with weekly mental health treatment, she refused to comply with the recommendation of the Agency and service providers that she receive intensive mental health treatment to facilitate the inclusion of Mother in the Children's mental health treatment and to address serious concerns such as Mother's depression and suicidal ideations.[3] *Id.* at 9-10, 13-14, 16, 21, 27, 33-35.

Both Ms. Feicht and Ms. Fox noted that Mother declined any additional mental health treatment.[4] *Id.* at 9-10, 13-15, 30. Ms. Feicht stated, "When

---

[3] Corey Yaris testified to an "alarming" telephone call with Mother prior to the team meeting, intended to address Mother's inclusion in H.P.'s treatment, during which Mother expressed suicidal ideations. *Id.* at 47-48. Mr. Yaris described, "[b]ased on her behavioral presentation, it was clearly evident that she was not able to resolve the traumatic components what she was expressing as evidenced by frequent crying and elevated tone, various associated pitch, and a lot of thought distortion." *Id.* at 48. Mr. Yaris indicated that, as a result, he supported the recommendation for more intensive mental health treatment. *Id.* Moreover, he confirmed that Mother's behavior on the telephone call was not an anomaly. *Id.* at 49.

[4] Mother testified that the idea of more mental health treatment was raised, but she "didn't understand what they meant." *Id.* at 35. Mother further indicated that her current provider is not recommending any additional treatment. *Id.* at 36. When confronted with her attitude toward additional treatment, Mother stated that she was "doing what [she] could at the time to help [herself]." *Id.* at 43. Mother continued, "[i]f I need to go more with the therapist that I have, then I will, but nobody told me that I needed to do more with my therapist. They're trying to say I need more mental health and not explaining how or what I really need." *Id.* at 44.

I called [Mother] to discuss this with her, she told me no and that she cannot handle more mental health services." *Id.* at 20. Likewise, Ms. Fox recounted, "I spoke to her -- I spoke to her a couple times to state that, you know, that was the recommendation. She state[d] that she is happy with her mental health right now and state[d] that she feels that it's going well and did not wish to do any more mental health." *Id.* at 30. Mother's unwillingness to take the necessary steps to stabilize her mental health does not show she is fully working towards a plan for reunification with the Children.

We also acknowledge that Mother attends visitation with the Children and participates in visit coaching.[5] *Id.* at 7, 9, 12, 15-16, 26-27, 36-37. However, during visitation with the Children, Mother has difficulty engaging with the Children. *Id.* at 28-29, 31. Ms. Fox testified, in part,

> . . .I do see concerns in the engagement. I cannot speak to mental healthwise [sic], but I do see a concern sometimes that mom does seem depressed, depressive, shows tendencies of depression; and it does seem to affect the visits. I see that she does have a difficult time at times engaging with the children, and so it's difficult at times; but I have seen where the children and her [sic] have a strained relationship.

*Id.* She continued,

> . . .We have done some read-along books. That seems to help a lot. I have, you know, needed to get mom's -- she at times seems at a loss of what to do at the visits. Again, they are on Zoom, but

---

[5] At the time of the hearing, visitation took place through Zoom. *Id.* at 7. Visitation alternated weekly from two-hour group visits to two-hour individual visits, with R.B. and S.B. sharing individual visits. *Id.* at 7-8, 11.

she does seem at a loss; and we do speak about some things to try to help to engage. . . .

*Id.* at 29.

Further, the Children regress after visitation and contact with Mother.

*Id.* at 8, 15, 20, 50. As to the regressive behaviors, Ms. Feicht described:

> Following visitation, [H.P.], [S.B.], and [R.B.] all revert back to behaviors that they had when they were coming into care. [S.B.] bangs her head on the floor to help soothe herself, and which she has developed a very large scab on her forehead, and sometimes it bruises depending on how long she's able to let it heal. [R.B.], like, was sleeping in a bed. He has begun to sleep back in his Pack'n Play as well as not using the words that he typically uses. He has been more talkative since coming to the foster home. They work on him with his words and his utensils, and he doesn't use any of that following visits.

> And [H.P.] will try to save resources like food and toilet paper. So she'll go periods where she won't wipe herself or will try to save food because she's afraid there won't be enough. The foster family has worked with Family Based through all of this giving the foster parents ways to help work through things and get the children back on an regular schedule. However, once they tend to get these kids back in a normal routine, visitation happens again, and they're cycling back through.

*Id.* at 8-9. As a result, the Agency removed Mother's telephone contact with the Children. *Id.* at 15.

Moreover, and importantly, the evidence established that the Children are doing well and "thriving" in their placements, which are permanency options. *Id.* at 22-24, 50-52. Therefore, we find support in the record for the trial court's determination that a goal change was in the best interests of the Children.

Furthermore, we find no merit to Mother's claim that the trial court abused its discretion in changing the Children's goal to adoption only eleven months after they were adjudicated dependent. This Court has recognized that the "fifteen-to-twenty-month period outlined in § 6351 is not a prerequisite to a goal change, but rather, an aspirational target in which to attain permanency." *In Int. of L.T.*, 158 A.3d 1266, 1279 (Pa.Super. 2017).

Accordingly, we discern no abuse of discretion in the trial court's decision to change the Children's permanent placement goal to adoption. We, therefore, affirm the trial court's orders.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/31/2021